IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Ranga Brahmamdam, M.D., | : | |
| | : | Case No. 1:19-cv-152 |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | Magistrate Judge Karen L. Litkovitz |
| | : | |
| TriHealth, Inc., *et al.*, | : | **Order Granting Plaintiff's Motion for** |
| | : | **Summary Judgment; Granting** |
| Defendants. | : | **Defendants's Motion for Summary** |
| | : | **Judgment; and Granting in Part and** |
| | : | **Denying in Part** |
| | : | **Defendant/Counterclaimant's Motion** |
| | : | **for Summary Judgment** |
| | : | |
| | : | |
| | : | |

This employment discrimination action is before the Court on Plaintiff Ranga Brahmamdam's Motion for Summary Judgment Against Defendant/Counterclaimant Margo Alexander (Doc. 107), Defendants TriHealth, Inc.'s and TriHealth G, LLC's (collectively, "TriHealth") Motion for Summary Judgment (Doc. 108), and Alexander's Motion for Summary Judgment (Doc. 109). For the reasons that follow, Brahmamdam's Motion (Doc. 107) will be **GRANTED**, TriHealth's Motion (Doc. 108) will be **GRANTED**, and Alexander's Motion (Doc. 109) will be **GRANTED IN PART and DENIED IN PART**.

## I. BACKGROUND

### A. Facts

This is an employment discrimination action in which Brahmamdam, a physician in a position of authority, had a relationship of a sexual nature with both Alexander, his informal mentee/intern, and Shirisha Pasula, a medical resident. Brahmamdam exchanged thousands of

electronic communications with both women, which demonstrate that, although the relationships were consensual, both were tumultuous, inappropriate, and manipulative.

### i.  Brahmamdam's and Alexander's Relationship

Brahmamdam is a board-certified oncologist/hematologist, and he became a TriHealth employee in 2010 when TriHealth acquired his physician group, Oncology Partners Network. (Doc. 108-2 at PageID 3830; Doc. 120-1 at PageID 3946.)  He is of Indian descent and a practicing Hindu.  (Doc. 27 at PageID 337; Brahmamdam Decl., Doc. 119 at PageID 3923.)  He was born in 1962 and has resided in the United States since 1986.  (Brahmamdam Decl., Doc. 119 at PageID 3923; Doc. 108-2 at PageID 3830; Doc. 120-1 at PageID 3946.)

In 2018, Alexander was a 29-year-old Xavier University nursing student.  (Doc. 108-2 at Page ID 3831; Doc. 120-1 at PageID 3947.)  Pursuant to an agreement between TriHealth and Xavier University, Xavier University nursing students may fulfill their clinical requirements at TriHealth.  (Doc. 108-2 at PageID 3831; Doc. 120-1 at PageID 3946.)  As a nursing student, Alexander performed clinical rotations at TriHealth's Cancer Institute on the medial oncology unit from January 11 through April 27, 2018.  (Doc. 108-2 at PageID 3831; Doc. 120-1 at PageID 3947.)

Alexander and Brahmamdam first met in January 2018 while she was providing patient care with her clinical preceptor at TriHealth on the medical oncology unit.  (Doc. 109-1 at PageID 3872; Doc. 122-1 at PageID 3978.)  Not long thereafter, Brahmamdam offered to be her mentor and help her obtain a job.  (Alexander Dep., Doc. 90 at PageID 2436–37.)  The two developed what Alexander describes as a "quasi-mentorship/life coach/volunteer relationship." (Doc. 33 at PageID 392.)  Throughout the relationship, Brahmamdam and Alexander saw each other frequently and communicated regularly via text message, WhatsApp, and email.  They also

frequently spent time together in his office or their cars. (Doc 86-8 at PageID 1403; Alexander Dep., Doc. 90 at PageID 2651; Doc. 108-2 at PageID 3833; Doc. 120-1 at PageID 3947.) Brahmamdam instructed Alexander to not tell anyone she was seeing him every day, and on several occasions told her to avoid using TriHealth email to communicate with him. (Doc. 86-1 at PageID 1121; Doc. 86-5 at PageID 1198; Doc. 86-7 at PageID 1303, 1321.) He also told Alexander not to text him when he was with his wife. (Doc. 86-8 at PageID 1374; Alexander Dep., Doc. 90 at PageID 2620–21.) Brahmamdam's and Alexander's relationship continued after Alexander's clinical rotation ended in April 2018, and she served as an "informal intern" of Brahmamdam's through July 2018. (Doc. 108-2 at PageID 3832; Doc. 120-1 at PageID 3947.) Brahmamdam's mentorship of Alexander, as well as the informal intern arrangement, was outside the scope of Alexander's formal clinical rotation. (Doc. 108-2 at PageID 3832; Doc. 109-1 at PageID 3872; Doc. 120-1 at PageID 3947; Doc. 122-1 at PageID 3978.)

Throughout the course of their relationship, Alexander assisted Brahmamdam with various projects for his oncology group, including making PowerPoint presentations. (Alexander Dep., Doc. 90 at PageID 2600–01; Doc. 109-1 at PageID 3873; Doc. 122-1 at PageID 3978.) At times, Brahmamdam also allowed Alexander to accompany him when he visited his patients on the oncology unit. (Alexander Dep., Doc. 90 at PageID 2605.)

Brahmamdam and Alexander also shared personal information with one another, including Alexander revealing to Brahmamdam that she suffered from situational depression and attention deficit hyperactivity disorder ("ADHD"). (Doc. 108-2 at PageID 3832; Doc. 120-1 at PageID 3947; Doc. 90-1 at PageID 2703–04.) Alexander also revealed that she took medication to control her ADHD and considered herself addicted to the medication. (Doc. 90-1 at PageID 2703; Doc. 90-6 at PageID 2814.) Brahmamdam testified that during their mentorship, he often

noticed differences in Alexander's mood, and she frequently experienced ups and downs. (Doc. 88 at PageID 2256.) He offered to serve as Alexander's "life coach" by "guid[ing]" her in "improving self-control," "identifying triggers and introduction to cognitive therapy," "emotional intelligence," "key medical concepts," and "help planning next level." (Doc. 86-4 at PageID 1168–70.)

In this "life-coach" role, Brahmamdam tried to help Alexander manage her ADHD and suggested different medications she should try. (Alexander Dep., Doc. 90 at PageID 2590.) Although Brahmamdam is not a licensed psychiatrist or psychologist, he diagnosed Alexander as suffering from a series of psychological disorders and recommended different courses of treatment. (Brahmamdam Dep., Doc. 86 at PageID 828; Doc. 86-1 at PageID 1124; Brahmamdam Dep., Doc. 88 at PageID 2241, 2245–46; Doc. 88-1 at PageID 2365.) According to Alexander, Brahmamdam gave her medications to control her depression and ADHD, and wrote her a prescription for a medication and eye drops. (Alexander Dep., Doc. 90 at PageID 2648–49.) Brahmamdam refutes this and testified that he did not give Alexander any medications, and that Alexander may have obtained the medications by taking them from a bag he had in his office. (Brahmamdam Dep., Doc. 86 at PageID 830–31, 874, 878–79.) He does not, however, dispute he wrote her a prescription for a medication and eye drops. (*Id*. at PageID 891–92, 922.)

Alexander's and Brahmamdam's relationship was also of a sexual nature, although both testified that they often joked with one another. At times, and usually late in the evening, Brahmamdam and Alexander exchanged text messages regarding sexual activities. For example, Brahmamdam asked Alexander when she last had sex and when she last performed oral sex, and on several occasions asked her to tell him sexual stories. (Doc. 86-6 at PageID 1293; Doc. 86-8

4

at PageID 1392, 1412, 1442, 1453, 1455, 1472–73, 1478; Alexander Dep., Doc. 90 at PageID 2592.)  When asked why these text conversations occurred, Alexander testified that "Brahmamdam often asked about sexual experiences and he explained to me that he had an arranged marriage and that he had not had many experiences and that he was jealous of me having had experiences."  (Alexander Dep., Doc. 90 at PageID 2413.)  Brahmamdam's and Alexander's conversations also contained frequent references to "DD" or "ding dong." According to Brahmamdam, ding dong is a form of "spiritual relaxation and constitute[s] conversation of exchanging [*sic*] the affection in a relaxing way, rather than in a tight professional stressful environment."  (Brahmamdam Dep., Doc. 86 at PageID 941.)  Alexander testified that, depending on the person, ding dong referred to sex, sexual activity, or intimacy and affection.  (Alexander Dep., Doc. 90 at PageID 2529–30.)  Alexander also testified that she and Brahmamdam had kissed once and he had touched her breasts.  (*Id*. at PageID 2525.) Brahmamdam denied that this occurred.  (Brahmamdam Dep., Doc. 86 at PageID 1059; Doc. 88 at PageID 2306.)  In one series of text messages on May 2 and 3, 2018, Brahmamdam asked Alexander "[h]ow did u control your self," appearing to reference a sexual interaction they had in one of their cars.  (Doc. 86-8 at PageID 1366.)

### ii. Brahmamdam's Relationship with Shirisha Pasula

Brahmamdam met Shirisha Pasula in 2014 when she was a medical student.  (Doc. 108-2 at PageID 3837; Doc. 120-1 at PageID 3951.)  Brahmamdam testified that he and Pasula had a very close relationship and he viewed her as his sister or daughter.  (Brahmamdam Dep., Doc. 86 at PageID 864.)  In 2016, he helped Pasula secure a residency at TriHealth by introducing her to several TriHealth doctors and writing her a letter of recommendation.  (Doc. 108-2 at PageID 3837; Doc. 120-1 at PageID 3951.)

During the course of their relationship, Brahmamdam and Pasula regularly communicated via email and TriHealth's internal messaging application, and their communications demonstrate their relationship was, at times, tumultuous, as they often got into arguments. (Brahmamdam Dep., Doc. 87 at PageID 1659–60; Doc. 87-4 at PageID 2043–45, 2089, 2103.) Similar to his relationship with Alexander, Brahmamdam's and Pasula's electronic communications were at times of a sexual nature. (Doc. 87-4 at PageID 2094, 2102, 2140; Doc. 108-2 at PageID 3839; Doc. 120-1 at PageID 3952.) Alexander testified that on one occasion, she walked into Brahmamdam's office and observed him with his head in Pasula's breasts. (Alexander Dep., Doc. 90 at PageID 2472–73.) Alexander also testified that early on in her relationship with Brahmamdam, he told her that he wanted to make Pasula jealous by becoming best friends with Alexander. (Alexander Dep., Doc. 90 at PageID 2438–39.) On July 24, 2018, Pasula accused Brahmamdam of cheating on her with Alexander, to which Brahmamdam responded by stating Alexander "sexually assaulted" him. (Doc. 87-4 at PageID 2097.)

On July 6, 2018, Brahmamdam wrote a recommendation in support of Pasula's fellowship application. (Doc. 108-2 at PageID 3840; Doc. 120-1 at PageID 3953.) After Pasula told Brahmamdam that friendships depend on "an equal power level" where one friend does not dominate the other, and that was not the case with their relationship, Brahmamdam told her "I will with draw [*sic*] my recommendation for sure[.] You are not worth it." (Doc. 87-4 at PageID 2180.) According to Pasula's affidavit, she and Brahmamdam often joked with one another, and she never considered any of Brahmamdam's communications as unwelcome or harassing in nature. (Pasula Aff., Doc. 118 at PageID 3922.) She also testified that Brahmamdam did not mistreat her, and she never felt she was required to submit to any of Brahmamdam's conduct as a condition of her employment. (*Id.*)

### iii. Alexander's Informal Mentorship/Internship Ends and TriHealth Terminates Brahmamdam's Employment

In early July 2018, Brahmamdam's and Alexander's relationship began to break down. On July 2, 2018, Alexander sent him a text message suggesting that his wife and Pasula's husband should be informed about Brahmamdam's relationship with Pasula. (Doc. 86-10 at PageID 1514–16.) Thereafter, Brahmamdam accused Alexander of being unprofessional, to which Alexander responded with an email summarizing his unprofessional "interactions with women employees," and stating "[t]he very thing that you are doing gets a lot of powerful men fired because it is illegal." (Doc. 86-10 at PageID 1521–22.) Brahmamdam then told Alexander "[y]our fate is in your hand," "[b]y tomorrow u correct ur self other wise you will repent," "[y]ou unnecessarily screwed yourself bringing my wife and [Pasula]," and "[y]ou have to get a job – do u think all this will help u." (Doc. 86-10 at PageID 1518–19, 1523.) He also told Alexander that she needed "to say sexual encounters I described are exaggerated, I only acted affectionately I have not kissed boo[b]s, etc," and that "[i]f you are good we will be good . . . If u are bad, we will for sure be bad." (*Id*. at PageID 1524–25.)

Later on that evening, Alexander drafted an email in which she retracted her accusations against Brahmamdam, stating "I accused you of behaving unprofessionally despite having no evidence." (Doc. 86-11 at PageID 1526.) Prior to sending the email to Brahmamdam's TriHealth email address, Alexander asked Brahmamdam if he wanted her to screenshot the email and send it to him before she sent it to his email address "[s]o you can tell me if you like the email or want me to change part of it." (Doc. 86-10 at PageID 1523.) Alexander also offered to send another email if he wanted her to include any additional statements. (*Id*. at PageID 1525.)

On July 10, 2018, Alexander told Brahmamdam "I want to get out of this mess," to which Brahmamdam responded by stating "I think u need punishment[.] Now no one can stop me[.] I

decided[.]"  (Doc. 86-11 at PageID 1533.)  The next day, Jennifer Rehling, manager of the

primary nurses for TriHealth Cancer Institute, sent Alexander an email stating that her

mentorship with Brahmamdam has ended and she was to have no further contact with

Brahmamdam.  (Doc. 86-11 at PageID 1547.)  Rehling testified Brahmamdam directed her to

send the email to Alexander, although Brahmamdam testified the email was sent without his

permission.  (Brahmamdam Dep., Doc. 86 at PageID 1067–68; Rehling Dep., Doc. 101 at

PageID 3530–31.)  On July 12, 2018, Brahmamdam also sent Alexander an email stating he no

longer had time to serve as her mentor.  (Doc. 86-11 at PageID 1544.)

　　　　Approximately one month after her mentorship ended, Alexander began sending Julie

Van Curen, Nurse Manager II, and Rehling emails containing attachments of voluminous

communications between her and Brahmamdam during the course of their relationship.  (Doc.

108-2 at PageID 3842; Doc. 120-1 at PageID 3953.)  To provide context, Alexander sent a

follow up email stating:

> There are many more messages like that.  I printed 360 pages on WhatsApp alone.
> Anyway, I just sent a few because I don't know what Dr. Ranga said about me but
> I don't want a bad reputation and am really worried he may have given me one.
> So, I wanted to give you an idea about my experience to try to clear up [an]y
> misunderstandings.  Although I was initially uncomfortable with Dr. Ranga's
> affection, I was willing to do work for him and got involved because as [sic] he
> promised to mentor me and said he would help me get a job on [the medical
> oncology floor] . . . Over the course of 6-7 months, Dr. Ranga and I became very
> good friends.  I saw him nearly every day as he was my teacher/coach/mentor for
> awhile (until we had a falling out) . . . .

(Doc. 93-2 at PageID 3154.)  Three days later, without receiving a response, Alexander sent

another email to Van Curen and Rehling, echoing her previous sentiments:

> I emailed you those messages because I wanted to give you insight into what my
> relationship with Dr. Ranga was like – He asked me to come nearly every day (I
> didn't just show up without his permission).  Ultimately, his actions were the
> result of him getting mad at me for telling him that he should be honest about his
> relationship with Shirisha and his wife.  He, of course, denies that it is a

relationship and thinks he is "doing good" but this does not make sense and anyone can see right through it. Anyway, I do not want to get in trouble. I just wanted you to know more because I am concerned about my reputation at Good Sam[aritan] and believe that Dr. Ranga has been using me and portraying me in an inaccurate and unacceptable manner. I have all of my messages saved with Dr. Ranga. Please let me know if you need any additional information.

(*Id*. at PageID 3155.) Van Curen forwarded this information to Monica McPeek, TriHealth's Director of Risk Management and Assistant General Counsel. Additionally, Rehling testified that after she received these emails, Brahmamdam told her that Alexander was crazy, unstable, and a stalker. (Rehling Dep., Doc. 101 at PageID 3540–45, 3563–64.) Jennifer Mundstock, Brahmamdam's primary nurse, also testified that in June 2018 Brahmamdam referred to Alexander as being crazy and said she was coming to TriHealth without him asking her to and would not leave him alone. (Mundstock Dep., Doc. 103 at PageID 3680–81.) Brahmamdam denies making these statements, and alleges that nurses told him Alexander was stalking him. (Brahmamdam Dep., Doc. 86 at PageID 1068–70.)

Upon receiving Alexander's emails, McPeek began an investigation into the matter. (Doc. 108-2 at PageID 3842; Doc. 120-1 at PageID 3953.) DocHalo[1] messages between Pasula and Brahmamdam were retrieved from his computer, and McPeek compiled a timeline of Brahmamdam's communications with Alexander and Pasula. (McPeek Dep., Doc. 93 at PageID 2958, 2966–67.) McPeek also interviewed several individuals, including Alexander and Brahmamdam. (Doc. 108-2 at PageID 3842–43; Doc. 120-1 at PageID 3953–54.) Prior to meeting with McPeek, Brahmamdam sent a message to Pasula stating "[l]awyers from [Good Samaritan] coming to talk about [Alexander.] Make sure we will all say same thing – united strong." (Doc. 87-4 at PageID 2153.) On August 26, 2018, Brahmamdam also sent an email to

---

[1] DocHalo is TriHealth's secure internal messaging application.

McPeek outlining what he perceived were the mental health issues Alexander was experiencing. (Doc. 86-2 at PageID 1142.)

At the conclusion of the investigation, TriHealth leadership made the decision to terminate Brahmamdam's employment on August 27, 2018. (Doc. 108-2 at PageID 3844–45; Doc. 120-1 at PageID 3954–55.) Brahmamdam's termination letter stated he was being terminated for violating:

1. TriHealth Policy ER23.00, Harassment, Discriminatory and Bully Free Workplace;
2. TriHealth Policy ER10.00 Employee Code of Conduct;
3. Ohio law;
4. TriHealth HIPAA[2] Policies (and related Security Policies):
   - 08 HIPAA 01.00 HIPAA Use and Disclosures of Protected Health Information[;]
   - 08 HIPAA 21.00 HIPAA: Safeguards for Protected Health Information (PHI) and TriHealth Proprietary Information While Outside of TriHealth[;]
   - 08 HIPAA 4.0 HIPAA: Disclosing Protected Health Information to Business Associates[;]
5. Section 3 (a)[3] Physician obligation to actively support Company's health care mission, goals and objectives;
6. Section 3 (c) Physician obligation to maintain compliance with standard of professional ethics and conduct including without limitation, the standards, rules and regulations, opinions and decisions promulgated by the American Medical Association, the Ohio's State Medical Association, the Ohio State Medical Board and other licensing or credentialing authorities over the practice of medicine; and
7. Section 11 (a) (i)[4] and (iv) for failing to maintain a good reputation and character and for the health safety and welfare of patients and employees which are in jeopardy by your continued performance of duties under your [employment] Agreement.

(Doc. 95-1 at PageID 3305–06.)

---

[2] "HIPAA" means the Health Insurance Portability and Accountability Act.

[3] The "sections" cited in the termination letter refer to Brahmamdam's employment agreement with TriHealth.

[4] TriHealth indicates that the termination letter's citation to Section 11(a)(i) is an inadvertent error, and that the correct citation is Section 11(a)(ii). Section 11(a)(i) refers to a physician's death as a reason for terminating an employment agreement, which is not a situation now before the Court.

As the underlying basis for these reasons for termination, TriHealth referenced Brahmamdam's "inappropriate exchanges with a resident and mentee through electronic communications, physical relations and other non-professional conduct." (*Id*. at PageID 3305.) As to the HIPAA violations, Brahmamdam admits that after Alexander's clinical rotations ended in April 2018, he continued to allow her access to his office and the oncology unit, and that his office and computer contained extensive HIPAA-protected data. (Doc. 108-2 at PageID 3833; Doc 120-1 at PageID 3948.) He further admits that Alexander had access to his computer and knew his password, and that for one of Alexander's projects he provided her a spreadsheet that contained patient information. (Doc. 108-2 at PageID 3833; Doc. 120-1 at PageID 3948.)

### B. Procedural Posture

In his Second Amended Complaint (Doc. 27), Brahmamdam asserts seven claims against TriHealth. Count I alleges race discrimination in violation of 42 U.S.C. § 1981. Counts II and V allege discrimination based on color, national origin, race, and religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Ohio Revised Code §§ 4112.01(A) and 4112.99, respectively. Count III alleges age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 626 *et seq*.[5] Counts IV and VI allege TriHealth conspired to deprive Brahmamdam of his civil rights in violation 42 U.S.C. § 1985 and Ohio Revised Code §§ 4112.02(J) and 4112.99, respectively. And Count VII alleges breach of contract. Lastly, Count VIII alleges a state law claim of tortious interference with contract against Alexander, alleging she contacted TriHealth administrators and reported false accusations of Brahmamdam's unprofessional conduct.

---

[5] Count V also alleges age discrimination in violation of Ohio law.

Alexander filed two counterclaims against Brahmamdam alleging he retaliated against her for opposing his harassing conduct and participating in TriHealth's investigation of his conduct by (1) making derogatory and false statements about her, taking her off research projects, threatening her job prospects, and banning her from entering TriHealth facilities, and (2) bringing a claim of tortious interference with contract against her. (Doc. 33 at PageID 397–99.)

Brahmamdam moved for summary judgment against Alexander on her two retaliation claims. Alexander likewise moved for summary judgment on his claim of tortious interference with contract, and her two claims of retaliation. TriHealth moved for summary judgment against Brahmamdam on all claims asserted against it. All motions are fully briefed and ripe for this Court's review.

## II. STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc*., 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 257

(1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249.  "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also E.E.O.C. v. Ford Motor Co*., 782 F.3d 753, 760 (6th Cir. 2015) (en banc) (quoting *Scott*).  A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted).  "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

"The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380 (relying on videotape evidence to refute a party's alleged facts); *see Shreve*, 743 F.3d at 132–33.

## III.    ANALYSIS

Three motions for summary judgment are currently pending before the Court.  The Court first will address Alexander's retaliation claims, then Brahmamdam's claims against TriHealth, and conclude with Brahmamdam's tortious interference with contract claim.

## A. Brahmamdam's and Alexander's Cross-Motions for Summary Judgment

Brahmamdam and Alexander have filed cross-motions for summary judgment on Alexander's two claims of retaliation in violation of Ohio Revised Code § 4112.02(I). Alexander asserts two claims of retaliation under Ohio law, alleging Brahmamdam retaliated against her by (1) "making direct threats against her, demanding she retract statements, threatening her job prospects/job search, making defamatory, derogatory and false statements about her to third parties at TriHealth, taking her off research projects and banning her from entering TriHealth facilities in July and August 2018," and (2) filing a claim of tortious interference with contract against her. (Doc. 33 at PageID 397–99.)

Ohio Revised Code § 4112.02(I) provides that it shall be an unlawful discriminatory practice:

> For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

To establish a claim of retaliation under this provision, a claimant must prove "(1) she engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Greer-Burger v. Temesi*, 116 Ohio St. 3d 324, 879 N.E.2d 174, 180 (2007). If a claimant establishes a prima facie case of retaliation, the burden shifts to the defending party to "articulate some legitimate, nondiscriminatory reason" for its actions. *Id*. at 180 (citation omitted). If the defending party satisfies this burden, the burden then shifts back to the claimant to demonstrate

"the proffered reason was not the true reason for the employment decision." *Id*. (citation omitted).

As a threshold matter, the Court notes the unusual context within which Alexander asserts her retaliation claims, as she had an informal mentorship with Brahmamdam rather than an established employment relationship. The federal counterpart to Ohio's anti-retaliation provision provides, in relevant part, that it is "an unlawful employment practice for an *employer* to discriminate against any of his *employees*," and thus is only applicable in the context of an employment relationship. 42 U.S.C. § 2000e-3(a) (emphasis added); *Bryson v. MiddleField Volunteer Fire Dept., Inc.*, 656 F.3d 348 (6th Cir. 2011). Ohio Revised Code § 4112.02(I), however, uses the term "person," rather than "employee," and thus Ohio's anti-retaliation law is not limited in coverage to individuals in an employer-employee situation. *Hughes v. Miller*, 181 Ohio App. 3d 440, 909 N.E.2d 642, 647 (2009) (quoting *Carlisle v. Bennett Enters.*, No. 3:96CV 7447, 1997 U.S. Dist. LEXIS 18752, at *32 (N.D. Ohio July 29, 1997)); *LeMasters v. Christ Hosp.*, 777 F. Supp. 1378, 1381–82 (S.D. Ohio 1991); *Greer-Burger*, 789 N.E.2d at 180 n.2. Therefore, Alexander argues that her being an informal mentee of Brahmamdam is irrelevant for purposes of her retaliation claims. She draws the Court's attention to *Hughes*, wherein the plaintiff's employment had been terminated after the defendant, a former co-worker, had filed an internal complaint accusing the plaintiff of sexual harassment. 909 N.E.2d at 643–44. The plaintiff asserted a claim of defamation, and the defendant asserted a counterclaim of retaliation in violation of Ohio Revised Code § 4112.02(I). *Id*. The court ultimately reversed the trial court's sua sponte dismissal of the defendant's counterclaim. *Id*. at 652–53.

Although the scope of Ohio Revised Code § 4112.02(I) is broad under Ohio law, the Court finds it is too strained a reading of the statute to extend its application in the context of this

case.  Brahmamdam's and Alexander's relationship was that of an informal mentorship that the two arranged independently of TriHealth, as there is no indication TriHealth sanctioned or facilitated the mentorship.  The Court is not persuaded by Alexander's citation to *Hughes*, and she has not provided, and the Court is unaware of, any case law applying § 4112.02(I) in the context of an informal mentorship.  In the absence of such authority, the Court finds that Alexander's two counterclaims of retaliation fail as a matter of law.  Accordingly, Brahmamdam is entitled to summary judgment on these claims.

### B.  TriHealth's Motion for Summary Judgment

#### i.  Discrimination Based on Color, National Origin, Race, and Religion

Brahmamdam asserts TriHealth's decision to terminate him constituted color, national origin, race, and religious discrimination in violation of both state and federal law.  Courts analyze state law discrimination claims under Ohio Revised Code Chapter 4112 and federal discrimination claims under 42 U.S.C. § 1981 under the same framework used for Title VII discrimination claims.  *Smith v. City of Toldeo, Oh.*, 13 F.4th 508, 514 (6th Cir. 2021) (citing *Barrett v. Whirpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009); *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008); *Ohio Civ. Rts. Comm'n v. David Richard Ingram, D.C., Inc.*, 69 Ohio St. 3d 89, 630 N.E.2d 669, 674 (1994)).  Thus, the Court will address Brahmamdam's state law and federal law claims in tandem.

In absence of direct evidence of discrimination,[6] courts analyze discrimination claims using the test articulated in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973).  *Smith*, 13 F.4th at 514.  First, the plaintiff must demonstrate a prima facie case of discrimination, that is, "(1) [he] is a member of a protected group; (2) [he] was subjected to an adverse employment

---

[6] Brahmamdam does not assert he has offered any direct evidence of discrimination.

decision; (3) [he] was qualified for the position; and (4) . . . similarly situated non-protected employees were treated more favorably." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016) (quoting *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004)). After a plaintiff establishes a prima facie case, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Id*. at 778 (citing *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008)). Once a defendant offers a nondiscriminatory reason for the adverse action, the burden shifts back to the plaintiff to show the defendant's proffered reason "was not its true reason, but merely a pretext for discrimination." *Smith*, 13 F.4th at 515 (quoting *Jackson*, 814 F.3d at 776).

Here, in moving for summary judgment, TriHealth asserts Brahmamdam was fired for legitimate nondiscriminatory reasons and Brahmamdam failed to establish these reasons were pretextual. Because TriHealth does not address Brahmamdam's prima facie case, the Court will presume, for purposes of summary judgment only, that Brahmamdam has established a prima facie case of color, national origin, race, and religious discrimination. Thus, the Court immediately turns to the second *McDonnell Douglas* prong.

### a. Legitimate nondiscriminatory reasons

TriHealth argues it terminated Brahmamdam because he violated (1) TriHealth's HIPAA policies, (2) TriHealth's Harassment, Discriminatory, and Bully Free Workplace Policy, and (3) the terms of his employment agreement. (Doc. 95-1 at PageID 3305–06.) At the second step of the *McDonnell Douglas* test, a defendant's "burden is merely one of production, not persuasion; it involves no credibility assessment." *Revennaugh v. United States Postal Serv.*, Nos. 2:16-cv-783, 2:17-cv-879, 2019 WL 4674250, at *11 (S.D. Ohio Sept. 25, 2019) (quoting *Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 429 (6th Cir. 2007)). This burden is satisfied if the

defendant "simply explains what he has done or produces evidence of legitimate nondiscriminatory reasons." *Brown v. Oh. State Univ.*, 616 F. Supp. 2d 740, 750 (S.D. Ohio 2009) (quoting *Bd. of Tr. v. Sweeney*, 439 U.S. 24, 25 n.2 (1978) (cleaned up)).

TriHealth's stated reasons for terminating Brahmamdam for violating its policies and the terms of his employment agreement constitute legitimate nondiscriminatory reasons. *See Blackshear v. Interstate Brands Corp.*, 495 F. App'x 613, 618 (6th Cir. 2012) (holding that violation of a workplace policy against violence was a legitimate nondiscriminatory reason for termination); *see also Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 395–99 (6th Cir. 2008) (stating violation of HIPAA and patient privacy laws were legitimate nondiscriminatory reasons for termination); *Barker v. Paccar, Inc.*, No. 2:18-cv-338, 2019 WL 4040533, at *11 (S.D. Ohio Aug. 27, 2019) (finding violation of company's sexual harassment policy was a legitimate nondiscriminatory reason for termination); *Somogye v. Toldeo Clinic, Inc.*, No. 3:11 CV 496, 2012 WL 2191279, at *6–7 (N.D. Ohio June 14, 2012) (finding HIPAA violations were legitimate nondiscriminatory reasons for termination).

#### b. Pretext for discrimination

Brahmamdam argues that notwithstanding TriHealth's stated legitimate nondiscriminatory reasons for termination, an issue of material fact exists as to whether TriHealth's decision to terminate him was pretextual. In the Sixth Circuit, to demonstrate pretext a plaintiff may show that the offered reason for termination (1) had no basis in fact, (2) did not actually motivate the employer's conduct, or (3) was insufficient to explain the employer's conduct. *Raadschelders v. Columbus St. Comm. Coll.*, 377 F. Supp. 3d 844, 858 (S.D. Ohio 2019) (citing *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009)). Brahmamdam contends that TriHealth's articulated reasons for terminating his employment did

not actually motivate TriHealth's termination decision. To succeed on this basis, Brahmamdam must point to evidence "which tend[s] to prove that an illegal motivation was *more* likely than that offered by the defendant." *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 82 (6th Cir. 2020) (quoting *Brennan v. Tractor Supply Co.*, 237 F. App'x 9, 9 (6th Cir. 2007) (alteration and emphasis in original)); *see also Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) ("Pretext is a commonsense inquiry . . . [it] requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is.").

First, Brahmamdam denies that he violated the various TriHealth policies and terms of his employment agreement outlined in his termination letter.[7] (Brahmamdam Aff., Doc. 119.) Such a denial, however, is insufficient to create a genuine dispute of material fact. The Sixth Circuit has repeatedly distinguished between a plaintiff contesting the facts underlying his termination versus simply "den[ying] the defendant's articulated legitimate reason without producing substantiation of the denial," and held the latter is insufficient to withstand a motion for summary judgment. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992) (citing *Irvin v. Airco Carbide*, 837 F.2d 724 (6th Cir. 1987); *Ridenour v. Lawson Co.*, 791 F.2d 52 (6th Cir. 1986)). Here, Brahmamdam denies TriHealth's stated reasons for termination, but he does not genuinely dispute the underlying conduct. That is, Brahmamdam does not dispute that he held a position of influence as to Alexander and Pasula, the numerous electronic communications between him and Alexander and Pasula that have been submitted into the record are genuine, he provided Alexander access to confidential patient information after her clinical rotations ended,

---

[7] Brahmamdam also argues he did not violate TriHealth's corporate policy entitled "Employee Code of Conduct," policy number ER10.00 because the policy only applies to employees of TriHealth, Inc., and he was employed by TriHealth G, LLC. The policy, however, indicates it applies to "All TriHealth Entities," and TriHealth, Inc. encompasses TriHealth G, LLC. (Doc. 87-2 at PageID 1779; Doc. 125 at PageID 3991.) The Court therefore rejects this argument.

he prescribed Alexander a medication and eyedrops without charting them, and he allowed Alexander access to medications stored in a bag in his office.  Thus, Brahmamdam's denial does not create a question of material fact.  *Compare Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 438 (6th Cir. 2009) (denying summary judgment where plaintiff contested the facts underlying his termination, and thus presented a question of material fact).

Brahmamdam also claims that he believed Alexander had a business associate agreement with TriHealth such that she was permitted to access patient information, and that he only prescribed Alexander a medication and eyedrops because it was an "emergency." (Brahmamdam Dep., Doc. 86 at PageID 892; Brahmamdam Decl., Doc. 119 at PageID 3924.) Even taking these statements as true, however, is insufficient to create a question of fact as to pretext because, as previously noted, he does not genuinely dispute that he provided Alexander access to confidential patient information and prescribed her a medication and eyedrops without charting them.  *See Mitchell*, 964 F.2d at 585.

Next, Brahmamdam contends a question of fact exists as to pretext based on remarks by Mark Witte, the Executive Director for TriHealth Cancer Institute, and James Maher, the Medical Director for TriHealth Cancer Institute, both of whom participated in the decision-making process regarding Brahmamdam's termination.  In addition to establishing a prima facie case, in some circumstances discriminatory comments can also show pretext.  *See Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 813 (6th Cir. 2020) (analyzing allegedly ageist comments as circumstantial evidence of pretext); *see also Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 287 (6th Cir. 2012) ("[D]iscriminatory remarks, even by a nondecisionmaker, can serve as probative evidence of pretext.") (quoting *Risch*, 581 F.3d at 393).  "[I]f the comments were made by a person in a position to influence the alleged employment decision, they will be relevant unless

they are so isolated and ambiguous as to be nonprobative." *Clack v. Rock-Tenn Co.*, 304 F.

App'x 399, 405 (6th Cir. 2008) (quoting *Hopkins v. Electr. Data Sys. Corp.*, 196 F.3d 655, 665

(6th Cir. 1999) (Moore, J., dissenting)).

Brahmamdam claims that in 2015 or 2016: (1) Maher indicated that he wanted

Americans to be the face of TriHealth's Cancer Institute; (2) Witte told him Maher wanted

Americans in the oncology group; and (3) he interviewed a female physician of Indian descent

for a position at TriHealth, and Witte told him he was wasting his time because Maher is not

going to hire an Indian.  (Brahmamdam Dep., Doc. 87 at PageID 1623–26.)  To determine

whether discriminatory remarks are circumstantial evidence of discrimination, a court considers

factors such as the "identity of the speaker, the nature and substance of the comments, and the

temporal proximity of the comments to the challenged decision."[8] *Kiwewa v. Brennan*, No.

1:15-cv-815, 2017 WL 4712786, at *12 (S.D. Ohio Oct. 18, 2017) (quoting *Griffin v. Finkbeiner*,

689 F.3d 584, 595 (6th Cir. 2012)); *see Clack*, 304 F. App'x at 404–05.  Courts "do not view

each discriminatory remark in isolation, but are mindful that the remarks buttress one another as

well as any other pretextual evidence supporting an inference of discriminatory animus."

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998).

These statements, assuming they were uttered, are evidence of color, national origin, and

racial bias.  Moreover, they were made by individuals who participated in the decision to

terminate Brahmamdam's employment.  *See Ercegovich*, 154 F.3d at 354–55 (holding that a

decisionmaker's remarks reflecting bias against a plaintiff on the basis of a protected category

are relevant to pretext).  However, the Court finds that Brahmamdam's reliance on these

---

[8] Courts generally apply this analysis when determining whether alleged statements constitute direct evidence of discrimination.  *See Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 325–26 (6th Cir. 2021).  Brahmamdam, however, does not assert these comments are direct evidence of discrimination.

statements is too thin a reed upon which to establish pretext. Although Maher and Witte were involved in the decision to terminate Brahmamdam's employment, the decision was a collective decision made by multiple individuals,[9] and there is no indication the group was influenced by any factors beyond the facts revealed by the investigation. *See Doucet v. Univ. of Cincinnati*, No. 06-4118, 2007 WL 2445993, at *6 (6th Cir. Aug. 28, 2007) (holding that although two individuals involved in the decision to not reappoint the plaintiff had uttered allegedly discriminatory comments, the plaintiff presented no evidence from which a jury could conclude those individuals "sufficiently influenced the [reappointment] process so as to prompt the decision not to reappoint" the plaintiff). Further, the statements were remote in time, occurring two to three years prior to Brahmamdam's termination. *See Diebel v. L & H Res., LLC*, 492 F. App'x 523, 528, 533 (6th Cir. 2012) (stating "[t]he more time that passes between the remark and the adverse action, all else equal, the weaker the claim," and holding discriminatory comments made seven months prior to plaintiff's employment being terminated did not establish pretext); *Worthy v. Mich. Bell Telephone Co.*, 472 F. App'x 342, 347 (6th Cir. 2012) (holding alleged discriminatory comment made two and a half years prior to plaintiff's termination was insufficient to demonstrate pretext); *Myers v. Cuyahoga Cnty., Oh.*, 182 F. App'x 510, 520 (6th Cir. 2006) (holding offensive slur made three or four years prior to plaintiff's termination insufficient to create a jury issue regarding pretext).

Likewise, the comments did not address Brahmamdam in particular, and he has not established that the comments were related to the decisional process of terminating his employment. *See Blizzard*, 698 F.3d at 287 (affirming district court's finding of no pretext

---

[9] In addition to Maher and Witte, the group also included TriHealth's Human Resource Director, TriHealth's Chief Executive Officer, TriHealth's Chief Operating Officer, TriHealth's Chief People Officer, TriHealth's Regional Chief Medical Officer, and TriHealth's Senior Vice President and Quality Chief Medical Officer.

where discriminatory remarks were unrelated to the decisional process to terminate the plaintiff's employment); *see also Doucet*, 2007 WL 244593, at *6 (holding allegedly discriminatory comments were insufficient to establish pretext where comments were unrelated to the adverse employment action); *Benitez v. Tyson Fresh Meats, Inc.*, No. 3:18-cv-00491, 2022 WL 58399, at *35 (M.D. Tenn. Jan. 5, 2022) (finding no jury issue as to pretext based on racial slurs made by supervisor where comments were not numerous and did not "link [plaintiff's] race with a desire to terminate or take some other adverse action against him."). Therefore, Brahmamdam has failed to show "the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that [TriHealth's] explanation is a pretext, or coverup." *Doucet*, 2007 WL 2445993, at *6 (citation omitted). As such, no genuine issue of material fact exists regarding whether TriHealth's stated reasons for Brahmamdam's termination were pretext for color, national origin, or race discrimination. TriHealth is entitled to summary judgment in its favor on Brahmamdam's claims of color, national origin, and race discrimination.

Regarding his religious discrimination claims, Brahmamdam testified that Witte, in 2013 or 2014, and Maher, in 2016, asked him why he needed to pray in the morning, and they also asked him why he carried a religious book. (Brahmamdam Dep., Doc. 87 at PageID 1628–31.) Brahmamdam also testified that when began practicing with Oncology Partners Network in 1999, "everybody," including Witte and Maher, asked him why he wore ashes on his forehead in the morning prior to seeing patients, but, aside from new employees, they stopped making these comments in 2000 "when they got used to it." (*Id*. at PageID 1628–30, 1631–34.) As with Maher's and Witte's comments regarding American and Indian physicians, these comments are remote in time and Brahmamdam has not demonstrated they were related to the termination decision. Thus, Brahmamdam has not presented sufficient evidence to allow his religious

discrimination claims to proceed to trial.  Summary judgment in TriHealth's favor on Brahmamdam's religious discrimination claims is therefore appropriate.

### ii.  Age Discrimination

Next, Brahmamdam claims he was terminated because of his age in violation of the ADEA and Ohio's state law corollary.  Due to the similarity between the two statutes, when a plaintiff asserts claims under both the ADEA and Ohio law in federal court, the two claims are analyzed together using the federal standard.  *Hodges v. City of Milford*, 918 F. Supp. 2d 721, 734 (S.D. Ohio 2013) (citing *Williams v. General Elec. Co.*, 269 F. Supp. 2d 958, 966 (S.D. Ohio 2003); *Cochran v. Columbia Gas of Oh., Inc.*, 138 Ohio App. 3d 888, 742 N.E.2d 734, 738 (2000)).  The Court will thus address Brahmamdam's state law and federal law claims under the ADEA.

To demonstrate unlawful treatment under the ADEA, a plaintiff must present evidence that the employer's action would not have occurred "but-for" the plaintiff's age.  *Blizzard*, 698 F.3d at 283 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)).  Merely showing that the plaintiff's "age was a motivating factor in the adverse action" is insufficient.  *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 529 (6th Cir. 2014) (citing *Gross*, 557 U.S. at 177–78).  Where no direct evidence of age discrimination is presented,[10] a court employs the *McDonnell Douglas* burden-shifting framework.  *Blizzard*, 698 F.3d at 283.  As the Court has already found TriHealth's stated reasons for Brahmamdam's termination are legitimate and nondiscriminatory, the Court will begin with the third *McDonnell Douglass* step.

---

[10] Brahmamdam does not argue he presented direct evidence of age discrimination.

### a. Pretext for discrimination

As with the other discrimination claims, Brahmamdam argues TriHealth's proffered reasons did not actually motivate its decision.[11]  First, he seeks to establish disparate treatment as evidence of pretext.  For such an argument to succeed, he must present "evidence that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct to that which [TriHealth] contends motivated its discipline of [Brahmamdam]."  *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 893 (6th Cir. 2020) (quoting *Chattman v. Toho Tenax Am.*, 686 F.3d 339, 349 (6th Cir. 2012)).  This analysis is akin to the similarly-situated comparator analysis at the prima facie stage under which a plaintiff must demonstrate he is similarly situated "in all relevant aspects of their respective employment circumstances" with the proposed comparator.  *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004).

Brahmamdam avers Pasula, who was 32 years old in 2018, is a comparator whose treatment evidences pretext.  According to Pasula, she was never disciplined for any alleged violations of TriHealth's policies for her interactions with Brahmamdam.  (Pasula Aff., Doc. 118 at PageID 3922.)  Likewise, she was never disciplined for her participation in the activities whereby TriHealth claims HIPAA information was transmitted to Alexander.  (*Id.*)  Despite participating in similar activities for which Brahmamdam was terminated, the Court finds that Pasula is not a relevant comparator as there are factors that distinguish the two.  First, Brahmamdam's and Alexander's communications and interactions formed one basis for his termination, and there is no evidence the relationship between Pasula and Alexander was of a

---

[11] To the extent Brahmamdam contends any of his arguments discussed *supra* create a genuine issue of material fact as to whether TriHealth's proffered reasons for termination were pretext for age discrimination, the Court rejects such arguments for its previously stated reasons.

similar nature. Second, Pasula was a medical resident, while Brahmamdam was a senior practitioner and her superior. *See Leadbetter*, 385 F.3d at 691 ("Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated.").

Next, Brahmamdam seeks to demonstrate pretext based on comments of Maher and Witte. Brahmamdam testified Witte had previously remarked he wanted to hire "young and energetic" physicians at TriHealth's Cancer Institute. (Brahmamdam Dep., Doc. 87 at PageID 1623.) Yet this comment is not evidence of pretext as a desire to "attract young people . . . says *nothing* about terminating older employees." *Miles*, 946 F.3d at 896 (emphasis in original); *see also Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 325–26 (6th Cir. 2021) (following *Miles* and holding "[h]iring younger [employees] does not require the termination of older employees"). Brahmamdam also testified Witte inquired about Brahmamdam's retirement plans on several occasions in 2016 or 2017. (Brahmamdam Dep., Doc. 87 at PageID 1627.) As Brahmamdam was terminated in August 2018, these inquiries are too temporally isolated to establish pretext. *See Diebel*, 492 F. App'x at 528, 533 (holding discriminatory remarks made seven months prior to employee's termination were too isolated to establish pretext); *Pelcha*, 988 F.3d at 326–27. Further, comments on an employee's retirement plans, without more, do not show age-based animus. *Metz v. Titanium Metals Corp.*, 475 F. App'x 33, 35 (6th Cir. 2012) (citing *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997)). And, as TriHealth has pointed out, Brahmamdam admitted that Witte's inquires were made with friendly intent. (Brahmamdam Dep., Doc. 87 at PageID 1627.) As such, Brahmamdam has failed to demonstrate a question of material fact regarding whether TriHealth's stated reasons for his termination were pretext for illegal age discrimination, and TriHealth is entitled to judgment in its favor on these claims.

26

### iii. Breach of Employment Agreement

TriHealth argues Brahmamdam's breach of contract claim fails because Brahmamdam cannot demonstrate any breach on behalf of TriHealth.  To establish a breach of contract claim, the plaintiff must demonstrate (1) the existence of a contract, (2) the plaintiff performed under the contract, (3) the defendant breached the contract, and (4) loss or damages to the plaintiff. *Nnazor v. Cent. State Univ.*, 79 N.E.3d 1278, 1282 (Ct. App. 2016).

Brahmamdam's sole argument in support of his breach of contract claim is that TriHealth failed to provide him prior written notice of his behavior that constituted a breach of his employment agreement.  Section 11(a) of Brahmamdam's employment agreement states TriHealth may terminate a physician's employment if

> (ii) Physician, in Company's good faith determination, (A) fails to maintain a good reputation or character or (B) fails to work harmoniously with others such that Company, TriHealth, and/or the Hospitals are unable to provide services in an efficient and orderly manner, and Physician fails to sustainably cure the identified behavior/situation within ten (10) days of receipt of written notice from the Company[.]

(Doc. 93-1 at PageID 3038.)  TriHealth argues that it was not required to provide Brahmamdam prior written notice because the ten-day notice and cure period only applies to Section 11(a)(ii)(B), and Brahmamdam was terminated for violating Section 11(a)(ii)(A).

The Court, however, need not parse this contractual provision because, even assuming the ten-day notice and cure period applies to Section 11(a)(ii)(A), TriHealth is still entitled to summary judgment on Brahmamdam's breach of contract claim.  Brahmamdam's termination letter indicated his employment was also terminated pursuant to Section 11(a)(iv), which provides that TriHealth may terminate a physician's employment if "Company in good faith determines that the health, safety, or welfare of patients or employees of Company, the Hospitals, TriHealth, or their affiliates are jeopardized by Physician's continued performance of

duties under this Agreement."  (*Id.*)  Termination pursuant to Section 11(a)(iv) does not require

any advance written notice or cure period.  Although Brahmamdam argues that he "did not

violate [Section] 11 of his employment agreement" (Doc. 120 at PageID 3936), he has failed to

provide any facts supporting this conclusory assertion and he has also admitted many underlying

facts as the Court noted *supra* in ruling on Brahmamdam's color, national origin, race, and

religious discrimination claims.  Thus, the Court finds that Brahmamdam does not genuinely

dispute that that he violated Section 11(a)(iv).  As Section 11(a)(iv) was an independent ground

for termination of Brahmamdam's employment, whether TriHealth provided him with a ten-day

notice and cure period is immaterial.  Accordingly, TriHealth is entitled to summary judgment in

its favor on Brahmamdam's breach of contract claim.

### iv.  Aiding and Abetting in Violation of Ohio Revised Code § 4112.02(J)

Ohio Revised Code § 4112.02(J) provides that "[i]t shall be an unlawful discriminatory

practice . . . [f]or any person to aid[] [or] abet . . . the doing of any act declared by this section to

be an unlawful discriminatory practice."  Brahmamdam argues that Maher and Witte aided and

abetted his termination in violation of federal law.  However, Brahmamdam only asserts a claim

of aiding and abetting against TriHealth, and "[a] corporate entity may not aid and abet itself in

discriminating against a plaintiff."  *Glass v. Tradesmen Int'l, LLC*, 505 F. Supp. 3d 747, 762

(N.D. Ohio 2020) (citing *Sampson v. Sisters of Mercy Willard, Oh.*, No. 3:12-cv-00824, 2015

WL 3953053, at *10 (N.D. Ohio June 29, 2015)).  Moreover, since Brahmamdam has failed to

show a triable issue of fact regarding the underlying discrimination claims, his aiding and

abetting claim necessarily fails.  *Shahbabian v. TriHealth, Inc.*, No. 1:18-cv-790, 2021 WL

3110073, at *10 (S.D. Ohio July 22, 2021).  TriHealth's Motion is granted as to Brahmamdam's

aiding and abetting claim.

### v. Conspiracy to Interfere with Civil Rights in Violation of 42 U.S.C. § 1985

Similar to Brahmamdam's aiding and abetting claim under Ohio law, his conspiracy

claim under 42 U.S.C. § 1985 also fails because TriHealth cannot conspire with itself. *Carney v.*

*Columbus City Schs. Bd. of Educ.*, No. 2:18-cv-250, 2020 WL 1921206, at *4 (S.D. Ohio Apr.

21, 2020) ("Because the . . . [defendants] are officers and employees of the same entity, as a

matter of law, the actions amongst them cannot give rise to a claim for conspiracy" under 42

U.S.C. § 1985.) (citing *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Edu.*, 926

F.2d 505, 510 (6th Cir. 1991)).  Additionally, because TriHealth is entitled to summary judgment

on Brahmamdam's underlying discrimination claims, it is likewise entitled to summary judgment

on his 42 U.S.C. § 1985 claim.  *Thompson v. City of Memphis*, 86 F. App'x 96, 103 (6th Cir.

2004) (affirming dismissal of 42 U.S.C. § 1985 claim where the plaintiff failed to establish an

employment discrimination claim).  TriHealth's Motion is granted as to Brahmamdam's 42

U.S.C. § 1985 claim.

### C. Alexander's Motion for Summary Judgment

Alexander contends summary judgment in her favor is warranted on Brahmamdam's

tortious interference with contract claim.  To succeed on a tortious interference with contract

claim, a plaintiff must show "(1) the existence of a contract, (2) the wrongdoer's knowledge of

the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of

justification, and (5) resulting damages." *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.

3d 171, 707 N.E.2d 853, 858 (1999).  Alexander argues Brahmamdam's claim fails because he

cannot prove the second, third, or fourth elements.

The Court begins its analysis with the fourth element, as it finds this element dispositive

of Brahmamdam's claim.  This element makes clear that in order to be actionable, the

interference with the contract must be improper. *Horter v. Investment Mgmt., LLC v. Cutter*, 257 F. Supp. 3d 892, 925 (S.D. Ohio 2017). In determining whether an actor has acted improperly in intentionally interfering with a contract, an Ohio court considers:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Fred Siegel*, 707 N.E.2d at 860 (citing Restatement (Second) of Torts § 767 (1979)).

Regarding Alexander's motive, Brahmamdam contends she sought to exact revenge on him for ending her mentorship and ceasing all contact with her. (Doc. 122 at PageID 3972–73.) In support of his argument, Brahmamdam indicates Alexander "hate[d] it" when he ignored her and, after being informed her mentorship ended, sent him a text message stating "you will regret that" decision. (Doc. 90-11 at PageID 2861; Doc. 90-13 at PageID 2885.) Alexander has presented evidence indicating that her stated motive for sharing these communications with TriHealth was to "give [TriHealth] an idea about my experience to try and clear up [any] misunderstandings" regarding her reputation. (Doc. 93-2 at PageID 3154–55.) When McPeek contacted Alexander regarding her complaint, Alexander told her she was concerned Brahmamdam may have given her a bad reputation and that he may be treating another mentee in a similar fashion. (McPeek Dep., Doc. 93 at PageID 2953–54.)

Regardless of the parties' dispute of Alexander's intent, the Court finds that, even assuming Brahmamdam can prove the remaining elements of a tortious interference claim, Alexander's actions were not improper as a matter of law. The nature of the conduct and interests sought to be advanced favor Alexander, as Alexander merely sent TriHealth administrators copies of her electronic communications with Brahmamdam, and there is no

indication these communications were altered or that she provided false information.[12]  Societal interests and the interests of TriHealth also weigh in Alexander's favor, as informing employers of an employee's inappropriate relationship with inferiors—in this case an informal mentee/intern and a medical resident—helps to deter similar conduct from occurring in the future and promote an atmosphere of professionalism and respect in the workplace.  Accordingly, Alexander is entitled to summary judgment on Brahmamdam's claim of tortious interference with contract.

## IV.  CONCLUSION

For the reasons stated herein, the Court **GRANTS** summary judgment in favor of TriHealth on Counts I, II, III, IV, V, VI, and VII; **GRANTS** summary judgment in favor of Alexander on Count VIII; and **GRANTS** summary judgment in favor of Brahmamdam on Alexander's two counterclaims of retaliation.

**IT IS SO ORDERED**.

S/Susan J. Dlott
Susan J. Dlott
United States District Judge

---

[12] Brahmamdam asserts because Alexander never told TriHealth she believed the electronic communications between her and Brahmamdam were a joke, this is "evidence that Alexander provided false information."  (Doc. 122 at PageID 3972.)  As best as the Court can discern, Brahmamdam appears to be implying the communications were a hoax, which is not the case.  The Court is not persuaded by Brahmamdam's argument.